GENERAL HOUSES, INC., a corporation, Plaintiff,

v.

Franklin G. FLOETE, as Administrator of General Services, Marloch Manufacturing Corporation, a corporation, The Greenport Basin & Construction Company, a corporation, and Elizabeth W. Tulloch and Charles M. Ross, as Executors and Trustees of the Estate of Marshall E. Tulloch, Deceased, Defendants.

Civ. A. No. 10994.
United States District Court
E. D. New York.
Sept. 19, 1958.

Bokat & Bokat, New York City, by Edmund W. Bokat, New York City, of counsel, for plaintiff.

Donovan, Leisure, Newton & Irvine, New York City, Marloch, Greenport and Tulloch by Walter R. Mansfield and Helmut Furth, New York City, of counsel, for defendants.

Charles R. L. Hemmersley, New York City, for Franklin G. Floete, administrator of General Services, substituted defendant.

BYERS, Chief Judge.

The plaintiff's claims for relief pursuant to which judgment is sought in the sum of $6,200,000 with interest at five per cent from August 16, 1947, are alleged to be based upon two separate contracts, one with Reconstruction Finance Corporation (R.F.C.) dated February 7, 1947, and the other with Marloch Manufacturing Corporation (Marloch) dated March 14, 1947.

Judgment in the same amount is sought against Marloch; obviously it is by way of alternative relief, since the subject-matter is the same in both causes, namely 2,000 prefabricated houses which were contracted for production by plaintiff according to the first contract. The distinction between these two claims for relief is necessary to an understanding of this litigation.

The case has been explained in a general way in General Houses, Inc., v. Marloch, 2 Cir., 239 F.2d 510, 511, but inaccurately—as will be pointed out—in respect to so much of the opinion as states: "When the R.F.C. refused ei-

ther to provide forms for tendering the houses, or to accept the houses when tendered informally, General Houses sued the R.F.C. in the federal court in Chicago."

The respects in which the foregoing statement is contradicted by the evidence, will be indicated below.

Having in mind the different sources of the plaintiff's asserted causes, a word should be said concerning the parties defendant: Floete, the first named, stands in the place of the R.F.C.

Marloch was a wholly owned subsidiary of Greenport Basin & Construction Company (Greenport). That company was not a party to either contract, and can be disregarded for all practical purposes.

Elizabeth W. Tulloch and Charles M. Ross, as executors and trustees, were substituted in place of Marshall E. Tulloch, deceased, who died on November 12, 1954. He had been the president and directing head of Marloch, and was originally named as a defendant in his personal capacity.

▮ In the so-called Count Three of the complaint it was alleged that R.F.C., Marloch, Greenport and Tulloch entered into a conspiracy "to induce and cause Marloch to breach" its contract (the second one involved) in certain alleged respects, which are enumerated at length, to the damage of plaintiff as asserted, in the sum of $6,200,000.

Paragraph 35 under this count reads in part,

"Neither Marloch, nor Greenport, nor Marshall E. Tulloch are made parties defendant under Count Three of this complaint."

However, as stated, they are named as alleged conspirators.

Count Four alleges in effect that Marloch induced and caused R.F.C. to breach its contract with plaintiff (being the first contract above referred to) whereby plaintiff is said to have been damaged to the extent of $6,200,000 for which judgment is asked against Marloch alone.

Paragraph 37 reads in part: "The sole defendant under Count Four * * * is Marloch. Neither R.F.C., nor Greenport, nor Marshall E. Tulloch are made parties defendant under Count Four of this Complaint."

Count Five alleges that R.F.C., Marloch, Greenport and Tulloch, illegally "jointly induced * * * R.F.C. to breach and not to perform * * *" the first contract. All four are made defendants in this count, and again judgment is sought in the sum of $6,200,000 which is said to include exemplary damages.

Count Six alleges the making of the second contract, and the existence of an actual controversy between plaintiff, R.F.C. and Marloch as to whether that contract "is effective or whether all rights and obligations thereunder have terminated."

That plaintiff is entitled to an appropriate declaratory judgment in respect thereof.

Concerning the last count, reference to the prior decision (239 F.2d 510, 513) is necessary. That was an appeal from an order of this court signed by Judge Bruchhausen on May 31, 1956, granting final judgment in favor of Marloch. That decision was reversed for reasons stated in the majority opinion; after holding that the order was appealable as to the first five counts, the opinion says,

"The sixth count for a declaratory judgment is clearly not appealable at this time for Marloch's * * assignee status makes it an indispensable party in determining the legal effect of the assignment. * * Therefore, we think there was no proper basis for the district judge's certificate as to the sixth count and the appeal as to that must be dismissed. We assume that the district judge will take action regarding the sixth count in a manner consistent with our decision."

As this was read by me at the outset of the trial, the hasty conclusion was reached that since the appeal was dis-

missed as to the sixth count, so much of the ruling under review was not affected, i. e. the dismissal was to stand. It seemed obvious that the opinion thus finally disposed of that particular count, because otherwise as to that also, the order in question would have been reversed, if deemed erroneous.

Upon the assumption that this *a priori* reasoning was faulty, the sixth count will be adjudicated as though it had not been dismissed, leaving to a reviewing court the decision as to whether in view of the procedural complexity thus revealed, there is still extant a justiciable issue concerning this aspect of the complaint.

In order to reduce the controversy to its lowest terms, attention is now directed to Counts Three, Four and Five.

At the close of the plaintiff's case, motions were made on the part of the R.F.C., Marloch and Tulloch, to dismiss for failure of proof, and on the merits. Decision was reserved, but as to Counts 3 to 5 inclusive it was indicated by the court that there was a failure of proof, i. e., testimony to support them. The court then interrogated counsel for the plaintiff on this subject:

"The Court: You have been familiar with the testimony, and I am asking you what testimony there is.

"Mr. Bokat: I can't point to any specific testimony at this point, your Honor.

"The Court: And your answer is the same as to the fourth and fifth counts in the complaint?

"Mr. Bokat: Yes, sir."

The foregoing is not conclusive on the plaintiff of course, and is merely cited to indicate that at the time the court and plaintiff's counsel were of substantially the same mind.

A careful review of the testimony and the documentary proof serves to confirm the opinion held at the trial.

The plaintiff's only witness was one Thomas H. Fisher, who described himself as an Illinois attorney. He said he had been familiar with the affairs of the plaintiff corporation as its general counsel, since prior to the date of the first contract. He had never been an officer or director, auditor or other official of the company. He said that the latter went out of business around the end of 1947 because of the unfortunate developments attending the subject-matter of this litigation. It did not formally dissolve.

He said that he knew nothing of the present whereabouts of the officers who conducted the corporate affairs, namely:

Frank M. Roberts, President,

J. W. Schurardt, Vice-President in charge of Sales,

Edgar R. Boone, Vice-President,

Fred'k W. Smith, Treasurer,

Philip Will, Jr., Secretary,

Goldie Carbaugh, Assistant Secretary, and

William M. Aiken, Assistant Secretary (a Washington attorney), now deceased.

He said that he was authorized to institute suit against the R.F.C. in the federal court in Chicago on August 29, 1947, by reason of the matters herein asserted. That suit was dismissed (D. C., 81 F.Supp. 202) for failure to make Marloch a defendant.

That he was authorized by the officers and directors to bring this suit which was started nearly eight years ago (August 1950), nearly three years after the corporation became defunct. He did not produce (pursuant to the court's request) any copy of a corporate resolution by directors or stockholders, to that effect.

He was on the witness stand for the better part of three days and his testimony was largely argumentative, discursive and frequently evasive.[1]

---

[1]. His role in the litigation was reminiscent of the entire ship's company of the fabled brig Nancy.

Since much of his recital was hearsay, and remote at that, it presented a paucity of factual substance upon which to base a decision. In the language of a distinguished essayist, he believed in the "efficacy of expostulation." Indeed, in lieu of evidence his sole contribution to the record was just that—expostulation. Most of the probative material before the court is found in the defendants' case.

The testimony in its entirety yields the following

*Finding 1:*

Counts *Three, Four and Five* have not been sustained by any evidence whatever, and for that reason should be dismissed on the merits.

Turning now to the cause as asserted against the R.F.C. (now Floete) it should be remembered by way of introduction that the Veterans' Emergency Housing Act of 1946, 50 U.S.C.A.Appendix § 1821 et seq., was enacted to relieve a housing shortage which was thought to fall most heavily upon former servicemen of World War II.

The office of Housing Expediter was created by statute to function in that behalf through the issuance of orders and regulations which were intended to influence and guide the activities of other governmental agencies, among them the R.F.C.

That body was authorized to make contracts with manufacturers of prefabricated houses which would guarantee to them that if they could not sell their product, the Government would in effect become the purchaser of their unsold houses, thus assuming the commercial risk which would otherwise rest upon the producers themselves.

■ It was such a contract that was entered into between the plaintiff and R.F.C., being the first contract in suit.

Omitting details for the present, the short of the plaintiff's case is that while it contracted to produce and sell 2,000 of such units, it actually sold but one, because the selling effort came to naught, and that it should be paid the contract price for the entire 2,000, namely $6,200,000.

It will appear that the plaintiff produced no houses whatever, but farmed out its performance to Marloch, and because the latter in effect terminated its contract with plaintiff for failure to receive orders from it, the second contract under which Marloch undertook to produce the entire 2,000 houses, should be deemed to have been broken, to the plaintiff's asserted damage to the tune of $6,200,000.

The first contract as stated, is dated February 7, 1947, and constitutes Exhibit A annexed to the complaint. It is too long for recital here, and it will suffice to refer only to the provisions directly involved:

The plaintiff is described as the Contractor and undertakes to produce (i. e. manufacture or assemble) by December 31, 1947, 2,000 prefabricated houses according to plans, specifications and production schedule incorporated by reference; the limit of allowable cost was $2,413 per house.

*Article A.*

1. This sets forth in detail provisions concerning the production and marketing of prefabricated houses, according to the plans, etc.

2. *Marketing:* This involves an approved plan of distribution, and that

"The Contractor shall \* \* \* exercise its best efforts to sell the prefabricated housing units produced hereunder to purchasers (having satisfactory credit ratings in cases of credit sales) at the Contractor's standard delivery prices (which the Contractor shall at all times maintain but may revise from time to time), and shall without undue delay accept orders from purchasers and shall deliver the units to such purchasers promptly after production thereof."

The importance of the foregoing will appear.

*Article B. is "Purchase by R.F.C."*

This is the basis of plaintiff's claim against R.F.C. (i. e. Floete), which constitutes "Count One" of the complaint.

It covers 12 typed pages, legal cap, and the presently material portions concern:

1. *Units covered by Guarantee.*

(a) Those completed by December 31, 1947. Exceptions not material here.

(b) If Contractor has completed production as per contract, except where failure to complete is due to causes not here involved; in that case, partially completed houses may be tendered.

2. *"Time of Tender.*

(a) Completed units shall not be tendered to R.F.C. earlier than 30 days after the date of completion of production thereof unless earlier tender shall be approved by R.F.C., or later than 120 days after the date of production thereof."

3. *"Number of Units.*

"The maximum number of units eligible for tender pursuant to paragraph 1 of this Article, which R.F.C. shall be obligated to purchase at the time of tender, shall be computed as follows:

"(a) With respect to completed units, the maximum number for each type of unit specified in Exhibit A (Drawings, Specifications and Production Schedule) shall be the number by which the number of completed units of such type which the Contractor has on hand at the close of the day preceding the date of tender exceeds the number of units of such type for which the Contractor has accepted and unfilled purchase orders on hand at the close of the day preceding the date of tender."

(b) has to do with partially completed units eligible for tender under 1 (b) above, not here material.

(c) deals with a possible reduction in the number of completed units as specified in (a) under a variety of circumstances not here involved.

4. *Condition of Units.*

They must conform to specifications, and be in first class condition; further: "* * * at the time of tender to R.F.C. the Contractor shall so warrant in writing in addition to such further warranties as the Contractor customarily makes to purchasers * * *."

5. *"Tender.*

"Tender shall be made by mailing to R.F.C., 811 Vermont Avenue, Washington 25, D.C., by registered mail, a notice of tender in form required by R.F.C. together with such documents of title as R.F.C. may require and the warranties to R.F.C. mentioned in paragraph 4 of this Article. The date of mailing such notice and documents to R.F.C. shall be deemed the date of tender for the purposes of this Article."

6. *"R.F.C. Purchase Price.*

"The purchase price which R.F.C. shall be obligated to pay for each completed or partially completed unit of any type purchased by R.F.C. hereunder shall be the cost of the unit determined in accordance with the cost and accounting principles specified in Article K; provided, however, that such R.F.C. purchase price shall in no event exceed a maximum amount which,

"(a) in the case of a completed unit, shall be the lesser of the following: (i) 90 per cent of the Contractor's standard f. o. b. plant delivery price in effect on the date of tender with respect to sale of a unit of such type to a purchaser of the class to which the Contractor's lowest delivery price is applicable, or (ii) the limit of allowable cost, as defined in paragraph 7 of this Article * * *.

"(b) in the case of a partially completed unit * * *". (not here material).

7. *"Limit of Allowable Cost.* The 'limit of allowable cost' to which reference is made" (above) "is the amount, as estimated by the Contractor and approved by the Housing Expediter, which reasonably will cover the Contractor's unit cost of each type of prefabricated

housing unit specified in Exhibit A. The limit of allowable cost for each type is set forth in Exhibit A and shall remain unchanged unless adjusted by the Housing Expediter pursuant to the following provisions."

The foregoing is followed by sub-paragraphs (a), (b) and (c) which are not recited for there is no testimony of adjustment in this connection.

The limit of allowable cost stated in Schedule A is $2,413 per unit.

8. *"Payment of R.F.C. Purchase Price.*

"(Payment not a waiver of R.F.C. rights under Contractor's warranty.)

"(a) Within 20 days after receipt of tender, R.F.C. shall make a provisional payment to Contractor in an amount equal to 90 percent of the maximum amount of R.F.C. purchase price specified in subdivision (a) or subdivision (b) of paragraph 6 of this Article * * *."

(b) provides for an audit in case there is no agreement respecting the R.F.C. purchase price.

(c) for settlement within 20 days thereafter.

9. *Termination of R.F.C. Purchase Obligation.*

There was no termination in this case.

*Article C. Storage and Preservation.*

This has to do with units purchased by R.F.C., of which there were none.

*Article D. Repurchase by Contractor.* None here involved.

*Articles E. and F.*

These deal with *Consultant Services* by Contractor, if requested; and *Patent Indemnity.*

*Article G. Reports.*

This specifies under 12 numbered paragraphs, that 20 days after the end of each calendar month the Contractor shall furnish to R.F.C. a report setting forth details as to number of units on hand, with completion data, the number delivered to purchasers, the number of accepted orders, unfilled orders, etc.

*Article H.* specifies accounting practices and records to be maintained by the Contractor.

*Article I. Statutory Compliance.* (i. e., no benefits to public officials.)

*Article J.* specifies the functions of the Housing Expediter.

*Articles K. and L. .*

These deal with cost and accounting principles and the incorporation of Exhibit A.

*Article M.*

This restricts assignability of the contract and is of importance with reference to the so-called "Second Count" in the complaint.

*Article N.*

This deals with Contractor's indebtedness to R.F.C. and set-off.

Since the plaintiff alleges that it fully performed all obligations by it to be performed, until the alleged breach of the contract by R.F.C., it is necessary to compare the testimony offered by the plaintiff with the contractual requirements in some detail.

Concerning the "best efforts to sell" undertaking found in Article A(2) (a), the Fisher testimony is without value, as would be expected on the part of a lawyer who did not participate in the effort. He did not know how many salesmen the company had, but that Schurardt was in charge of Sales. He said that before February 7, 1947 (the date of the first contract), the plaintiff informed dealers "that there was a possibility that these houses would be made under Government guarantee—get these documents that we call escrows, which I may have used the word 'order' on, but which were not accepted and unfilled purchase orders—* * *. We got this large number of 151, and as soon as our contract with the Government had been signed, we then attempted to produce these houses, and as a part of their production to interest the public in pushing

the houses, and these dealers were all communicated with, the total number being some 650-odd, including the 151 to whom I have referred."

■ Again, that the specifications and plans were shown presumably to dealers; also a demonstration unit was provided; also photographs were shown to dealers.

There was no testimony as to the work of a sales organization in the field; no reports of the results of solicitation in any given territory; no advertising matter was produced; nor financial records of expenditures in connection with publication or distribution thereof.

The showing of the Fisher testimony on this subject is that only anemic efforts at best were made by the plaintiff to live up to its contractual selling obligation.

One of the mysteries in the case has to do with the so-called 151 escrow deposits said to have been made on the 151 transactions referred to in the quoted testimony. None was transmitted to Marloch, as will be seen in discussing the second contract. This aspect of the case just dissipated into thin air.

It will also appear that under date of May 21, 1947, a letter was written by Marloch to plaintiff on the subject of its failure to send orders which contains the following:

"Personally, I am sure you can find a market right in this territory."

It further appears that ultimately Marloch was able to sell the 33 houses which it completed under the second contract to be later discussed, at an average price in excess of the allowable unit cost of $2,413 stated in Schedule A attached to the first contract.

That result was reached in the course of liquidation; the price can scarcely be thought of as one quoted by a "willing" seller. The fact that these sales were effected is practical evidence that if the plaintiff had put forth such exertions as would fall within a fair description of "best selling efforts", it would not have turned in so sorry a showing as but one order actually taken.

The testimony as a whole demonstrates to the satisfaction of this court that in this important respect the plaintiff has entirely failed to sustain its burden of proof.

*Finding 2:*

The plaintiff did not "exercise its best efforts to sell the prefabricated housing units" in performance of its obligation under Article A, subdivision 2(b) of the Market Guarantee Agreement in suit, and hence was in default in that respect on August 16, 1947, to R.F.C.

It may be added by way of comment, that the corporate attitude, if any is to be discerned in the Fisher testimony, is that the legislation underlying these contracts should be interpreted as having been designed primarily for the benefit of contractors, rather than in the public interest.

That misconception is quite apparent in connection with the subject of "tender," pursuant to the provisions of Article B of the Market Guarantee Contract.

Since the plaintiff's alleged cause against the R.F.C. (Floete) is that the latter breached its duty to purchase the 2,000 units from plaintiff, it is necessary to be clear about the incidents touching the alleged tender, and the capacity of the plaintiff to invoke its asserted rights, on August 16, 1947, when it sent the telegram to the R.F.C. which constitutes Exhibit B attached to the complaint.

Presumably that is the subject-matter of the quotation from the opinion above referred to.

It should be stated at once that R.F.C. did not "refuse to provide forms for tendering the houses, or to accept them when tendered informally," for they never were tendered within the terms of the contract, either informally or formally. Nor was there a refusal to cooperate so as to enable plaintiff to protect its contract rights.

While that telegram was sent at a time when the second contract with Mar-

loch was the one under which production of the units was going forward, the Market Guarantee contract was in full force and effect as between plaintiff and R.F.C.; thus if plaintiff wished to impose the obligation to purchase, it was required to conform to the terms nominated in the bond, namely Article B thereof.

The events preceding the sending of the telegram were briefly these: The plaintiff had contracted with Marloch (March 14, 1947) to take over the production duties which it assumed under the first contract, while it agreed to do the selling of the housing units. Some of the details of that engagement will be referred to in connection with "Count Two" of the complaint.

By reason of the plaintiff's failure to do any selling—with the exception of one unit—Marloch notified the former under date of August 6, 1947, that unless prior to August 16, 1947, "you (plaintiff) have sent us shipping instructions or otherwise made payment to us for the completed prefabricated housing units above referred to, (i. e., 17 complete, ready for shipment; 15 in process) or have, in some other equivalent manner, evidenced a reasonable manifestation of your ability and intent to perform your obligations under our March 14, 1947 agreement, we shall as of August 16, 1947, consider our duties under the March 14, 1947 contract discharged."

Instead of complying with Marloch's request for shipping instructions (i. e. orders), plaintiff sent on August 16th to R.F.C. the telegram constituting Exhibit B attached to the complaint. Eleven days earlier it had wired R.F.C. to send forms for notice of tender, documents of title and warranties (see provisions of Article B of the Market Guarantee Agreement) and also for forms for increasing allowable costs limit (para. 7 of said Article).

In reply to that request the Housing Expediter's Office wrote to explain that no forms of tender had yet been established, that R.F.C. and Housing Expe-

diter hoped to agree within a week or ten days upon proper procedure; that no forms were needed as to increasing the limit of allowable cost, but no action on that subject was permissible until plaintiff should submit "complete breakdown of current unit prices of materials and labor;" that plaintiff was "completely delinquent in submitting the basic documents * * * as to cost of materials and labor, and plaintiff's certified drawings and specifications."

Aside from the obvious failure of the telegram of August 16th to accord with the provisions of par. 5 of the said Article, and turning to its (the telegram's) contents, it will be seen that:

(a) If it be assumed that 17 completed and 15 partly completed units are sufficiently identified to indicate to R.F. C. that the sender referred to the subject-matter of the Market Guarantee Agreement, it is equally clear that the data required to comply with par. 3 was neither submitted nor promised.

(b) The reference to "approximately one hundred prefabricated units" is unintelligible. Probably this was based upon the passage in the Marloch letter of August 6, 1947 (Exhibit D, Complaint), which said that in addition to the 15 units in process, "(We) have inventory and raw materials on hand or committed, for the production of an approximate one hundred (100) prefabricated housing units."

Of course the contract contains nothing to the effect that units which have no existence, complete or partial, can be made the subject of the R.F.C.'s contract to purchase, through the medium of a purported "tender."

(c) Reference to 440 units "under production schedule to June 30, 1947" and 1340 ditto "to September 30, 1947." These last two items are even more remote (if that be possible) from the R.F.C. obligation to purchase.

Indeed it is difficult to accord a serious intent to the telegram which is patently at war with the terms of the

contract under which it purports to be sent.

So much was promptly suggested in a letter written by R.F.C. on August 18, 1947, in reply to the telegram. That letter states in part: "We expect shortly to have a form of notice of tender available. If meanwhile it is your intention actually to tender eligible units to us, I suggest that you 'phone us so that there will be no misunderstanding as to the requirements of clarity and sufficiency."

This latter suggestion was declined in plaintiff's telegram of August 21st stating a belief that the August 16th telegram was clear and sufficient; that without waiving "such tender" it would be glad to renew its tender on official forms when received.

By letter of the same date to R.F.C., plaintiff enclosed a form of proposed bill of sale from plaintiff to R.F.C. of 2,000 prefabricated housing units as described in the Market Guarantee contract, in consideration of $6,200,000.

In terms (according to the form), the plaintiff warranted its ownership of the 2,000 units which were in first class condition and suitable for their intended use.

It is difficult to grasp the mental process reflected in this document. Not only were about 1,967 housing units not in existence, but the other 33 or so were in the Marloch plant, and constituted property of that company until shipped out pursuant to orders accepted by plaintiff, sight draft attached to B/L.

The best that can be said for this paper is that it is symptomatic of the plaintiff's entire case.

Under date of August 25th R.F.C. replied by letter explaining the insufficiency in form and substance of the alleged tender. The letter contained the following:

"If you should decide actually to tender completed units to us and we receive an appropriate notice of tender and accompanying bill or bills of sale, we will consider the particular, identified units to have been tendered and, if we three upon investigation are satisfied that they conform to specifications and that there is compliance with all other conditions of tender and that the units are suitably stored, we will accept the tender and purchase the units as provided in the Market Guarantee Agreement."

The reply to this letter was signed by a Chicago lawyer, one Crawford (an associate of Fisher) and was dated August 29, 1947.

It stated that plaintiff considered its August 16th tender to be legally sufficient, and that plaintiff had filed in the federal court in Chicago its suit previously referred to.

The action was started while the 20 day period for initial payment measured from August 16, 1947 (Article B, par. 8), had yet 7 days to run.

The true object of that lawsuit may best be understood from what Fisher said to the witness Bloch, an attorney who in 1947 represented R.F.C. in Market Guarantee contracts, and particularly the one here involved. Fisher and another lawyer had an interview in Bloch's office with him on September 16, 1947, as to which his testimony is:

"Well, Mr. Fisher wanted to know what R.F.C. proposed to do in connection with this litigation, * * * and I indicated to him that the only thing that I could see that the R.F.C. was willing to do and could do would be to accept a tender, a proper tender of actual existing completed houses, and that we stood ready * * * to accept such a tender. * * *

"Mr. Fisher stated to me that he was not interested in a tender any longer, he wanted to know what R.F.C. would do by way of payment of the liability asserted in a $6,-200,000.00 lawsuit.

* * * * * *

"Mr. Fisher called me by telephone twice after that, within the

next week or two, I believe, and again asking me what R.F.C. was willing to do about the lawsuit. * * * "

The foregoing was not controverted in plaintiff's rebuttal. One reason may be found in the following extract from Fisher's testimony:

" * * * and it was discovered that it was impossible to sell mass-produced housing despite all the efforts we could make. * * * Therefore when the Housing Act was repealed the Government settled every other contract with identical contractees to ourselves, except ourselves. We are the only ones who did not get a settlement."

Later in the trial an offer of proof was made and disallowed as completely foreign to this litigation, that other contractors listed on Exhibit 21 for Identification had similar contracts to the plaintiff's and that "R.F.C. paid to certain of these contractors to relieve itself of liability on contracts similar to Plaintiff's Exhibit No. 1 the following:".

The inference is almost inescapable that the Chicago suit was instituted on August 29, 1947, and this one three years later, in the hope of forcing a settlement, rather than for the purpose of litigating what was believed to be a meritorious cause of action.

Based upon the entire testimony concerning "Count One" of the complaint, the following are made:

*Finding 3:*

The telegram sent by plaintiff to R. F.C. on August 16, 1947, was not a tender within the provisions of the Market Guarantee Agreement constituting Exhibit A attached to the complaint.

*Finding 4:*

No tender was ever made by plaintiff to R.F.C. of prefabricated housing units which were the subject of said contract, in conformity with the provisions of Article B thereof.

*Finding 5:*

The plaintiff was in default on August 16, 1947, under said contract, and failed to perform its obligations under Article A, para. 2(a) to exercise its best efforts to sell the prefabricated housing units which were the subject-matter of the contract.

*Finding 6:*

The R.F.C. did not breach the said contract concerning its duty to purchase any of said prefabricated housing units.

*Finding 7:*

No duty arose, pursuant to the terms of the said contract, on the part of R.F.C. to purchase from the plaintiff any of said prefabricated housing units.

*Finding 8:*

R.F.C. did not commit any breach of its Market Guarantee Agreement bearing the No. 219–P–10.

The remaining matter for decision is the plaintiff's claim for relief as asserted in "Count Two" against Marloch.

The basis is the contract between them dated March 14, 1947, constituting Exhibit C of the complaint.

The introductory recitals refer to the said Market Guarantee contract; the fact that General Houses has "technical and sales organization for such fabrication and the sale thereof," but no production facilities, which Marloch has; that these facilities are to be mutually available.

The contract provides that:

1. Marloch is to produce at Greenport, Long Island, and deliver f. o. b. public carrier for shipment, etc., "as General Houses may from time to time direct" the 2,000 prefabricated houses.

2. General Houses is to furnish drawings, etc., technical services, etc., as necessary.

3. "All houses manufactured by Marloch will be sold by General Houses through its own dealer organization."

4. Price per house $3,100 (subject to change, not now involved) sight draft B/L attached.

Details of payment not presently important.

*Note:* The statement of this figure is based upon the final agreement of counsel that it is correct.

5. If Marloch has on hand houses manufactured by it under the contract, but no shipping instructions as to them from General Houses, it may sell them directly, but at not less than the said contract price.

6. Marloch agrees to pay to General Houses a 2½% commission on any houses sold by it (including those under 5 above).

7. Marloch pays $20,000 to General Houses upon

&

8. a certain showing, to match a like amount provided by the latter, to the end that $40,000 of unimpaired capital is available to General Houses. The 2½% commission under 6, is to be credited to the $20,000 so advanced to General Houses by Marloch (instead of being repaid in cash).

9. Territorial restrictions.

&

10. (No present bearing.)

A second agreement also dated March 14, 1947, was entered into by General Houses with Marloch (Plaintiff's Exhibit 3) the purport of which is that the second contract was to be carried into effect through the assignment as collateral security, by the former to the latter, of General Houses' rights to call upon R.F.C. to purchase the said housing units through tender, as prescribed in the Market Guarantee Agreement.

A clause in Exhibit 3 reads that in the event "that claims against Reconstruction Finance Corporation should arise on account of * * * tender of housing units pursuant to the terms of said Market Guarantee contract, the parties hereto mutually promise and agree that neither shall look to the other

for, or claim or demand from the other, any of such claims * * *."

Strictly speaking, this cause as pleaded against Marloch does arise on account of General Houses' alleged tender under the Market Guarantee contract; however, since it is found that no tender was made, and indeed could not have been—as will be pointed out—I prefer not to base a decision on this branch of the case, upon the quoted clause.

The final contractual step is the assignment itself, Marloch Exhibit F, which superseded Exhibit E because of formal deficiencies therein.

Recurring now to the contract relied upon to sustain "Count Two," the evidence demonstrates that Marloch entered into the performance of its undertaking by establishing an adequate plant, and starting the production of prefabricated housing units in such a substantial manner that the projected program probably could have been executed by December 31, 1947, if the plaintiff had performed its undertaking to sell all houses so manufactured "through its own dealer organization."

The operations were put in charge of Mr. Joseph M. Baltz, an experienced builder generally, and specially with prefabricated houses. His testimony was uncontradicated as to the details of the plant which he assembled and put into operation for the production of the 2,000 units.

He was present at the preliminary negotiations that led up to the various contracts between these parties which have been recited; he was entirely versed in the practical requirements of production which were to become his duty to direct as Vice-President of Marloch.

Among these were the putting into condition of some six buildings for factory and office purposes, located in the Greenport Shipyard which occupied five or six acres of land; hiring and organizing personnel; procuring machinery and sundry materials as needed.

He testified that a so-called "Pilot House" was required by the R.F.C. and the Federal Housing Authority, and that such was completed and inspected about May 7, 1947.

The financial aspect of the enterprise was stated in the testimony of Charles M. Ross, the Marloch accountant, and the figures have not been challenged as to the Marloch investment.

The total investment was .........................$532,564.79 made up of:

Direct Costs:

|  |  |  |  |
|---|---:|---:|---:|
| Labor and materials for 33 houses | $178,183.31 | | |
| 2 demonstration units | 17,480.41 | | |
| Misc. panels and parts | 985.30 | | |
| Raw material inventory | 93,618.61 | | |
| Special machinery | 51,759.07 | $342,026.70 | |
| Administrative expenses | | 171,095.54 | |
| Liquidation expenses | | 19,442.55 | $532,564.79 |

The foregoing was in addition to the value of the land and buildings, etc. of $300,000.

The production schedule attached to the Market Guarantee Agreement was not adhered to; it was in terms a program for a producer then functioning which General Houses expected or purported to be, not for assembling a plant that had to be brought into existence and made to function by Marloch as a sub-contractor, some months after the original Market Guarantee Agreement was made.

The departure from that schedule was with the knowledge and approval of both the Housing Expediter and the R.F.C.; in any case, it is not a matter involved in this controversy.

Baltz testified that by the end of June Marloch could produce 3 houses a day, and from then on the increasing skills of the men on the job would have resulted in producing 20 a day, with some additional plant and equipment.

The testimony of Baltz concerning the conversations which led up to the making of the original contract with Marloch, clearly indicates that it was the representations made by General Houses concerning its then existing 151 so-called escrow contracts for the purchase of such units, which convinced Marloch that the selling capacity of General Houses was not a mere figment of someone's imagination. It was because of that representation that Marloch contributed $20,000 to the General Houses capital.

■ This testimony was objected to under the parol evidence rule, but not understandingly, as I think. It did not tend to alter, amend or modify a written instrument; it merely indicated that there was asserted to be an existing foundation to support the contractual undertaking that all houses to be manufactured by Marloch would be sold by plaintiff "through its own dealer organization."

It also served to explain why Marloch advanced $20,000 of its own money to help General Houses to operate.

The Marloch stake in the joint task was (at the outset) $513,122.24 together with the real estate and buildings.

The General Houses stake, namely the amount that it expended in whatever effort it may have exerted to perform its own undertaking, does not appear in the record; no witness was called who was familiar with the financial books and records of the company, or who even

professed to know their whereabouts. The witness Fisher said in effect that he presumed that such records are in a warehouse in Chicago, the address of which he said he did not know.

It is a fair inference that General Houses had and expended the $40,000 of capital, consisting, as to $20,000, of Marloch's contribution; but beyond that there is no legal evidence that General Houses made any outlay of its own, even faintly comparable to that of Marloch, in the effort to bring their common endeavors to fruition.

So far as plaintiff was concerned, its operations were of the shoe-string variety, for all that the evidence discloses.

The plaintiff sold exactly one house, as to which shipping instructions for delivery in New Britain, Connecticut, were received on June 26, 1947.

That delivery was made, and the draft was paid. The details of the transaction are unimportant.

The Baltz testimony reveals that as production went forward during the months of May and June, frequent requests were made by Marloch for shipping instructions so that an accumulation of units in the plant could be avoided. It appears that Schurardt took up lodgings in Greenport during this period, but whether he directed sales efforts there does not appear, since he was not a witness. There are two letters in evidence written by Marloch on May 21st and May 23rd concerning the necessity for prompt performance of the plaintiff's undertaking to make sales, in order to avoid interruption of production due to the threatened congestion in storage facilities.

The plaintiff's failure to make sales culminated in the situation revealed in the Marloch letter of August 6th, containing the warning that unless the plaintiff prior to August 16th sent shipping instructions for the completed units referred to, Marloch would consider its duties "under the March 14, 1947 contract discharged."

As has been seen, instead of selling any completed prefabricated houses, the plaintiff sent its telegram of August 16, 1947, to R.F.C., previously discussed.

At that date, the legal situation was this:

(a) Plaintiff purported to tender something which it did not own, since the entire property in the completed and partially completed units, and the materials from which further units could be assembled, was entirely and exclusively in Marloch. Thus the purported tender was but an empty gesture incapable of becoming anything else.

(b) Plaintiff had not requested Marloch to set aside to R.F.C. for disposition on its account, either the completed or partially completed units referred to in its said telegram; indeed the so-called "tender" telegram contained the following:

"  *   *   * We request that you (R.F.C.) and the Office of Housing Expediter do not communicate the contents of this telegram to (1) Marloch Manufacturing Company   *   *   *."

(c) Plaintiff had failed to perform its agreement to sell the houses produced by Marloch under the second contract in suit. That failure ripened into default, in view of the notice to plaintiff contained in the Marloch letter of August 6th.

If the plaintiff's position is understood, it comes down to an assertion that Marloch was obligated to produce the entire 2,000 housing units, notwithstanding plaintiff's failure to sell any, and its knowledge (according to Fisher) that there was no market therefor, to the end that eventually plaintiff might so manipulate its contractual relations with Marloch as to contrive an ostensibly legal call upon the Government to purchase the entire number of units originally contracted for by plaintiff.

No such raid upon the United States Treasury was legally justified, nor can Marloch be cast in damages because it elected to arrest the drain upon its remaining resources which resulted from

the plaintiff's breach of the second contract.

The bilateral nature of that contract is clearly spelled out in its terms.

It is true that while there is a production schedule (attached to the Market Guarantee contract), there is no stated selling schedule in the second contract, but none was necessary in the opinion of this court.

It is also true that the production schedule was not adhered to, but that is of no consequence because there is no suggestion that this deferred schedule was the cause of plaintiff's failure to send in orders. The Fisher testimony which has been quoted above, shows that plaintiff's only explanation of its default in performance was lack of demand; in other words, market conditions.

This means that the parallel and reciprocal engagements to produce, by Marloch, and to sell, by plaintiff, according to this theory were rendered incapable of accomplishment by extraneous conditions; if that were the fact, further performance on the part of either could not be exacted by the other. Cf. Fratelli Pantanella, S. A. v. International, Sup., 89 N.Y.S.2d 736.

The foregoing is the most favorable construction that can be accorded to the plaintiff's testimony.

A less favorable and perhaps more accurate understanding of the situation is, that with or without reason, the plaintiff committed a material breach of its contract in selling only one unit and in failing to sell any others, and thus justified Marloch in refusing to continue to produce prefabricated houses according to the contract of March 14, 1947. See Restatement (Contracts) Sec. 397.

The parallel and reciprocal nature of the engagements was inherent in the nature of the undertaking. While it cannot be said that the specific agreement of plaintiff to sell these houses meant that each unit completed should be matched by an accepted order, it did mean that the relationship of sales to production would be such that Mar-

loch should be able to finance its outlays for labor and materials from the proceeds of sales made by the plaintiff, and reasonably spaced over the period of time specified in the undertaking of the contractor, as set forth in R.F.C. Contract 219–P–10.

It falls within the test stated in the opinion in Canadian Industrial Alcohol Co. v. Dunbar, 258 N.Y. 194, at page 198, 179 N.E. 383, 384, 80 A.L.R. 1173, concerning " * * * a special group of circumstances appears from the terms of the contract, interpreted in the setting of the occasion, to have been a tacit or implied pre-supposition in the minds of the contracting parties, conditioning their belief in a continued obligation (citing cases)."

Marloch paid a high price for the business risk that it assumed by contracting with the plaintiff to take over its production engagement, as the above figures demonstrate; to assert that it was required to continue into the course of hopeless insolvency in order to enable the plaintiff to reap abundantly where it had not sown, is to urge that which is untenable as a legal proposition, and insupportable in any sense.

As to "Count Two" of the complaint, this court makes and states the following:

*Finding 9:*

The plaintiff failed to perform its obligation under the contract constituting Exhibit C attached to the complaint, reading:

"3. All houses manufactured by Marloch will be sold by General Houses through its own dealer organization"

in that by August 6, 1947, it had sold but one prefabricated housing unit covered by the said contract.

*Finding 10:*

Plaintiff's breach became final and absolute on August 16, 1947.

*Finding 11:*

Plaintiff's said breach of its contract was not caused by nor contributed to by any failure on the part of Marloch to

perform its obligations under the said contract.

*Finding 12:*

Marloch did not commit an anticipatory breach of its said obligations on August 6, 1947, or on any other date.

*Finding 13:*

Marloch did not hinder, delay or prevent performance of plaintiff's obligations under this or any other contract to which plaintiff was a party.

*Finding 14:*

Marloch's refusal to continue after August 16, 1947, to produce prefabricated houses pursuant to this contract, was based entirely upon plaintiff's said breach, and was a proper exercise of its legal rights created by the said contract.

*Finding 15:*

The plaintiff has failed to prove by competent evidence any cause of action, or legal claim for relief, against Marloch arising from the subject-matter of the foregoing finding.

Viewed in perspective, the record made at this trial completely vindicates the following observations contained in the dissenting opinion of Judge Medina in this case (General Houses, Inc., v. Marloch, 2 Cir., 239 F.2d 510, 515):

"This stale claim has been cluttering up the docket for many years. Experience teaches that the net result of the action now taken will be a period of shadow boxing, having little to do with a decision of the issues on the merits. * * *

* * * * * *

"I have already taken occasion to comment on 'artful maneuvers and procedural sallies which serve little purpose other than to throw sand in the judicial machinery' and to induce payments for what is euphemistically called 'nuisance value,' (citing); and I think that is what we have before us here. It is idle to talk about bringing the court calendars up to date, unless we are to be more realistic about clearing out the dead wood."

The writer of the foregoing in December of 1956 exercised extrasensory perception concerning the shadow boxing that he foresaw.

The defendant Floete as Administrator of General Services succeeded to R.F.C. for all purposes connected with this litigation, and was by order of March 25th, 1958 of this court, substituted in place of Reconstruction Finance Corporation. That agency of Government was abolished by Act of Congress effective June 30, 1957.

This cause then reaching the ripe age of seven years, fell within that section of the Act (68 Stat. 320, 15 U.S.C.A. § 603) which provided against the abatement of any such suit; also for proper court order in connection with an adequate showing.

Thus the order of March 25, 1958, which was made in response to plaintiff's motion to add as additional parties defendant, the United States of America and said Franklin G. Floete as Administrator etc., "and for an adjournment of the trial until all original defendants and such additional defendants shall have answered certain interrogatories heretofore propounded by plaintiff."

The motion was denied in all respects except to substitute Franklin G. Floete as a defendant in place of R.F.C.

The plaintiff sought reversal in the form of mandamus, which was denied by the Court of Appeals on April 28, 1958. General Houses, Inc., v. Bruchhausen, 2 Cir., 256 F.2d 674.

Certiorari was undertaken and application therefor was pending before the Supreme Court, when the case was called for trial early in May. The plaintiff sought adjournment pending the disposition of that application which was granted. About two weeks later when the case was again reached, the defendants made so convincing a plea for trial, that the court was convinced that in the interests of justice, no further delay should be allowed.*

---

* See 357 U.S. 924, 78 S.Ct. 1377, 2 L.Ed.2d 1369.

Trial got under way on May 20th and after a preliminary discussion between the court and counsel, based upon the opinion reported in 239 F.2d 510, the plaintiff's attorney of record (Mr. Bokat) called attention to the failure of Floete to file an answer of his own, and therefore asked that he be declared in default.

Upon being asked what harm would ensue to the plaintiff, if the answer of the R.F.C. already on file be deemed that of Floete, the following occurred:

"Mr. Fisher: That is objected to by the plaintiff.

"The Court: Why?

\* \* \* \* \* \*

"Mr. Fisher: We could not take our depositions until all the parties are in the case, and they have not filed answers, and the issues are not made up—the issues have never been made up. \* \* \*

\* \* \* \* \* \*

"The Court: Now I am going to try once more, and this is the last time I am going to try.

"Will you point out in what respect any new issues are imported into the case as a result of the action of the General Services Administrator in stating, 'The answer heretofore filed by the R.F.C. is my answer'?

"Mr. Fisher: \* \* \* There will be no difference in the pleaded issues, sir, in the complaint."

The trial thereupon proceeded to its close, on May 28th.

Thereafter the Supreme Court denied certiorari in respect of the application for mandamus.

The time lost between the order of March 25, 1958 and the opening of the trial, was occupied by the kind of activity accurately described in the quoted excerpts from the dissenting opinion of Judge Medina.

If a general finding on the subject by the District Court were appropriate, it would be to the effect that the plaintiff has been diligent to defer as long as possible, coming to grips with the merits of the claims for relief asserted in the complaint. The record as a whole indicates why.

With regard to "Count Six" of the complaint, if it has been erroneously supposed by this court that the earlier dismissal as to which appeal was dismissed, is to be disregarded in view of certain of the language in the prevailing opinion in 239 F.2d 510, and that Count is still to be adjudicated, the result cannot be favorable to the plaintiff.

Upon the entire record heretofore discussed at tedious length, the declaratory judgment sought by the plaintiff is denied, and judgment for the defendant Marloch on the merits, is granted.

### Conclusion of Law

The defendants are, and each of them is, awarded judgment on the merits against the plaintiff as to each and all of the so-called counts in the complaint, with costs.